Jerry **HODGES**, Plaintiff,

v.

**ATTORNEY GENERAL OF the UNITED STATES, Defendant.**

No. 11 Civ. 7735(RJS).

United States District Court, S.D. New York.

Sept. 30, 2013.

**484**

Jerry Hodges, pro se.

Assistant United States Attorney Alicia M. Simmons, New York, NY, for Defendant.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

■ Jerry Hodges ("Plaintiff"), a correctional officer at the Metropolitan Correctional Center in Manhattan ("MCC"), brings claims against his employer, the United States Bureau of Prisons ("BOP" or "Defendant"), for disability discrimination and retaliation pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Rehabilitation Act, 29 U.S.C. § 701 et seq., and the regulations relating thereto.[1] Now before the Court is Defendant's motion for summary judgment against Plaintiff on all claims. For the reasons set forth below and stated on the record following oral argument on September 23, 2013, the Court grants Defendant's motion in its entirety.

I. BACKGROUND

A. Facts

Plaintiff began working for the BOP in 1993 as a correctional officer at the MCC.[2]

---

1. The named Defendant in this action is the Attorney General of the United States because, technically, only the head of a government agency may be sued under the Rehabilitation Act. See Nobriga v. Dalton, No. 94 Civ 1972(SJ), 1996 WL 294354, at *2 (E.D.N.Y. May 28, 1996). However, since the parties generally refer to the BOP as Plaintiffs employer, this opinion uses BOP, instead of the Attorney General, synonymously with "employer" and "Defendant."

2. The following facts are generally taken from the parties' Local Civil Rule 56.1 Statements, the affidavits and declarations submitted in connection with the instant motion, and the exhibits attached thereto. Unless otherwise noted, where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In deciding this motion, the Court also considered Defen-

(Defendant's 56.1 Statement, Doc. No. 19 ("Def. 56.1"), ¶ 1.) In 1996, Plaintiff was promoted to the position of Senior Officer Specialist ("SOS"). (*Id.* ¶ 2.) The BOP requires that individuals holding such a position "be physically able and medically qualified to perform correctional work safely and successfully." (*Id.* ¶ 5.) The "Position Description" for such employees states that an SOS is responsible for "perform[ing] the full range of duties and responsibilities for detention, correctional supervision, protection, control and accountability of inmates." (Decl. of Alicia M. Simmons, dated Oct. 18, 2012, Doc. No. 18 ("Simmons Decl."), Ex. B ("Position Description") at 377 [3].) The Position Statement further provides that an SOS "[i]s subject to being in such hostile or life-threatening situations as riots, assaults and escape attempts." (*Id.*)

In September 2000, Plaintiff injured his ankle while responding to an emergency call, or a "body alarm," that occurred within the MCC. (Def. 56.1 ¶ 7.) In April 2002, Plaintiff underwent surgery on his ankle. (*Id.* ¶ 8.) After the surgery, Plaintiff's doctor imposed work restrictions prohibiting him from walking on uneven surfaces or climbing stairs, standing over a certain length of time, and pushing, pulling, or lifting objects over a certain weight. (*Id.* ¶ 9.) Plaintiff returned to work in 2003 as an SOS and was given a temporary modified assignment, or "TAD," that placed him on "phone assignment" in the third floor communications room and relieved him of any duty to respond to inmate emergencies. (*Id.* ¶¶ 10, 11.)

Plaintiff left this TAD in January 2006 to undergo a second surgical procedure on his ankle. (*Id.* ¶ 12.) In or around October 2006, Plaintiff sought to return to work in his previous position as phone monitor but was told by the warden that no positions were available. (Simmons Decl., Ex. A ("Hodges Dep.") [4] at 50:12–22.) On January 17, 2007, Plaintiff filed his first EEO complaint ("2007 EEO Complaint") against Defendant (Def. 56.1 ¶ 14), alleging that BOP failed to provide him with a reasonable accommodation for his ankle injury (Simmons Decl., Ex. G ("2009 Lawsuit Summary Judgment Hr'g Tr.") at 12:18–21). On February 24, 2009, Plaintiff then filed a complaint against Defendant in the Southern District of New York (Case No. 09 Civ. 1776(RJS)(GWG) (the "2009 Lawsuit")) alleging that Defendant discriminated and retaliated against him in violation of the Rehabilitation Act. (*See* Simmons Decl., Ex. F ("2009 Lawsuit ECF Docket Sheet") at Doc. No. 2; 2009 Lawsuit Summary Judgment Hr'g Tr. at 9:5–11.) Thereafter, the parties consented to have the Honorable Gabriel Gorenstein, Magistrate Judge, preside over all phases

---

dant's memorandum of law in support of its motion (Doc. No. 17 ("Mem.")), Plaintiff's memorandum of law in opposition to the motion (Doc. No. 28 ("Opp'n")), Defendant's reply brief (Doc. No. 30 ("Reply")), and the transcript from the oral argument ("Tr.") on September 23, 2013.

3. References to page numbers reflect the Bates Stamp number on the pages of Exhibit B.

4. Defendant and Plaintiff each submit different portions of Plaintiff's deposition, which took place on August 24, 2012. (*See* Simmons Decl., Ex. A; Decl. of Jerry Hodges, dated Dec. 11, 2012, Doc. No. 27 ("Hodges Decl."), Ex. 9.) The Court does not distinguish between the two sets of excerpts, but instead refers to both as "Hodges Dep." and cites to the page numbers of the transcript. The Court further notes that each of the exhibits attached to Plaintiffs Declaration are labeled as one number higher than the exhibit number that Plaintiff assigned to them (that is, what Plaintiff labeled as "Exhibit 9" appears as "Exhibit 10" on ECF). Throughout this opinion, the Court uses the number assigned by Plaintiff.

of the case. (*See* 2009 Lawsuit ECF Docket Sheet at Doc. No. 19.)

On December 7, 2009, while the litigation before Judge Gorenstein was proceeding, an independent medical examiner from the Department of Labor's Office of Worker's Compensation Program ("OWCP"), Dr. Jeffrey Meyer, lifted Plaintiff's medical restrictions and declared that Plaintiff was capable of performing "all duties of a Correction Officer." (Def. 56.1 ¶ 15.) The BOP subsequently ordered Plaintiff to report to duty in a letter dated February 3, 2010. (*Id.* ¶ 16; Simmons Decl., Ex. I ("Feb. 2010 BOP Letter").) After receiving the BOP's letter, Plaintiff informed the BOP and OWCP that he would first visit his personal physician, Dr. John Feder ("Feder"), in order to "get his approval to return to work." (Def. 56.1 ¶ 17.) Plaintiff then provided the BOP with a note from Feder, dated February 11, 2010, stating that Plaintiff could only return to work with "restrictions"—specifically, Feder indicated that Plaintiff "may not lift, push or pull over 150 [pounds], no climbing stairs or ladder, no standing more than 4 hours." (*Id.* ¶¶ 18–19; Simmons Deck, Ex. K ("Feder Note").) Feder's letter did not indicate that these restrictions were only for a specified duration or that they would expire at some point in the future. (Feder Note.)

After receiving the Feder Note, Defendant placed Plaintiff in a TAD as a phone monitor in the first floor communications room, where he was not required to respond to inmate emergencies. (Def. 56.1 ¶ 20.) Every three months thereafter, up through July 2011, Plaintiff submitted a request, or bid, for placement in a different post, including in the third floor communications room. (*Id.* ¶ 22.[5]) According to Plaintiff, these posts were to be assigned on the basis of seniority and he was among the most senior employees. (Plaintiffs 56.1 Statement, Doc. No. 29 ("Pl. 56.1"), ¶¶ 33, 36–37.) Nevertheless, while there is some discrepancy as to whether Plaintiff's union or Defendant made the decision, the parties agree that Plaintiff's bid was never granted. (*Id.* ¶ 23; Def. 56.1 ¶ 23.)

While Plaintiff was working in his TAD assignment, Defendant asked Plaintiff to provide updated information as to his physical condition and his ability to perform the job duties of an SOS, and Feder provided several responses with varying sets of restrictions, including as to whether Plaintiff was able to climb stairs. (*See* Simmons Decl., Ex. L ("Sept. 2010 BOP Letter").)[6] For instance, on May 4, 2010, Feder sent documentation to Defendant maintaining that Plaintiff should engage in "no repetitive stair climbing" and no "stand[ing] for longer than four (4) hours." (*Id.*) On June 4, 2010, Feder stated that Plaintiffs restrictions included "no standing" and no walking for over four hours. (*Id.*) Then, on August 10, 2010, Feder submitted another letter to the BOP permitting Plaintiff to attend firearms recertification as his "current orthopedic condition" did not preclude this. (*Id.*)

---

**5.** This paragraph of Defendant's 56.1 Statement actually says "up to July 2010," but based on the underlying sources cited in support of that statement, it is clear that this is a typographical error and that the correct date is July 2011. (*See* Hodges Dep. at 108:14–19.)

**6.** The Sept. 2010 BOP Letter, which is from Defendant to Plaintiff and dated September 3, 2010, characterizes and quotes from earlier letters exchanged between the parties. These prior letters were not made part of the record. However, as no party disputes the description of these earlier letters provided in the Sept. 2010 BOP Letter, the Court adopts these characterizations.

In response to these shifting requirements, Defendant sent a letter to Plaintiff, dated September 3, 2010, requesting that he submit documentation from Feder clarifying this "fluctuation of medical restrictions." (*Id.*) Feder thereafter submitted a note, dated October 5, 2010, stating that Plaintiff was unable to perform his full range of duties, including repetitive stair climbing. (*See* Hodges Decl., Ex. 6 ("Merit Systems Protection Board Decision" or "MSPB Decision") at 6.) In a letter dated November 10, 2010, Defendant responded that every MCC employee must be able to respond to emergencies and noted Plaintiff's inability to do so; accordingly, Defendant provided Plaintiff with a request for reasonable accommodation form. (*Id.*) Plaintiff submitted the form, writing that he "does not agree with the agenc[y's] position but, [he is] interested in [a] reasonable accommodation." (*Id.*) On November 19, 2010, Defendant sent a response to Plaintiffs request for an accommodation stating that it would only search for non-law enforcement positions outside the MCC for Plaintiff. (Simmons Decl., Ex. O ("Request Form").)[7] In the interim, Plaintiff continued to work at the TAD assignment in the first floor communications room.

On December 15, 2010, Plaintiff contacted an EEO counselor (Def. 56.1 ¶ 24) and thereafter, submitted a "Request for EEO Counseling" form (the "Request Form"), dated December 29, 2010, alleging that he had been discriminated against since returning to work. In the section where the Request Form prompts the employee to identify the basis for the alleged discrimination, Plaintiff checked the boxes for "Physical Disability" and "Reprisal." (Request Form.) He then explained, "Since

February 8th of this year I have been harassed in various forms, whether the harassment was subtle and at times blatant it is believed that it was retaliatory in nature." (*Id.*) When prompted to state the specific discriminatory actions taken against him and dates on which they occurred, Plaintiff provided a chronology of events over the preceding months, including the following instances: in October 2010, after Plaintiff went to assist with a "shakedown" requested by the warden, Lieutenant Flores gave Plaintiff a "[c]ounseling" or reprimand for going above the third floor; on November 19, 2010, he received a response to his reasonable accommodation request, stating that "Defendant will only look for non[-]law enforcement positions in Grand [P]rarie, or the regional and central offices," which Plaintiff noted was "retaliatory as the agency was not following the reassignment process outlined in the reasonable accommodation section"; on December 8, 2010, Plaintiff was approached by a lieutenant, who informed him that another lieutenant was making inquiries into Plaintiff's schedule; and, on December 17, 2010, Plaintiff was given a counseling by Lieutenant Flores about responding to body alarms despite his not responding to a body alarm in several months. (*Id.*)

On January 28, 2011, Plaintiff then filed a "Complaint of Discrimination," or EEO complaint, with the BOP, which referenced his "[EEOC] paper work submitted . . . in December 2010"—presumably a reference to the Request Form submitted on December 29, 2010. (Def. 56.1 ¶ 24; Simmons Decl., Ex. N ("2011 EEO Complaint").) In that document, Plaintiff also noted that he had a pending federal court case; refer-

**7.** There is some discrepancy as to the precise contents of this communication (*see* MSPB Decision at 6); however, since neither party has included the actual email in the summary

judgment record, and Defendant does not contest Plaintiffs characterization of the email, the Court adopts Plaintiff's characterization for the purposes of this motion.

enced a December 17, 2010 incident in which he "was counseled for something [he] did not do"; and, stated that there were "other actions that have been taken against [him] that [he] will discuss during the process." (*Id.*)

A few weeks later, on February 18, 2011, Judge Gorenstein granted Defendant's motion for summary judgment and dismissed the 2009 Lawsuit. (2009 Lawsuit ECF Docket Sheet at Doc. No. 39.) Specifically, Judge Gorenstein granted Defendant's summary judgment motion as to Plaintiff's retaliation claim because he failed to exhaust his administrative remedies for this claim as his EEOC complaint neither mentioned the alleged protected activity on which his claim was based nor indicated retaliation or reprisal as a basis for his claim; it only listed and discussed disability discrimination. (2009 Lawsuit Summary Judgment Hr'g Tr. at 12:17–13:7.) As for the discrimination claim, Judge Gorenstein held that Plaintiff could not make out a reasonable accommodation claim because he was unable to show that there was a specific, existing vacant position for which he was qualified at the time he returned to work or within a reasonable time thereafter. (*Id.* at 15:18–16:14.) In addition, the Court held that any claim of intentional discrimination would also fail because "the defendant has put forth a legitimate nondiscriminatory reason for its action: Namely, that plaintiff could not perform any available position with or without reasonable accommodation" (*id.* at 20:22–25), and Plaintiff did not provide evidence sufficient to show that Defendant's true motive was discriminatory animus and Defendant's proffered reason was false (*id.* at 21:5–22:10).

On May 20, 2011, Defendant sent a letter reaffirming that all correctional officers must to be able to respond to emergencies and that Plaintiff was unable to do so; the May 20th letter also indicated that there were no positions at MCC to which Plaintiff could be reassigned. (MSPB Decision at 9.) On July 20, 2011, Defendant discharged Plaintiff, stating that there were no positions at the MCC that were suitable for him in light of his physical restrictions. (*Id.* at 11.) In August 2011, Plaintiff filed an appeal of his termination with the MSPB. (*Id.* at 1.) A two-day hearing (the "MSPB Hearing") was conducted and, on March 16, 2012, the MSPB issued a decision returning Plaintiff to work and granting him backpay. (*Id.* at 1–2, 48.)

B. Procedural History

On October 31, 2011—after Plaintiff filed his MSPB appeal but before the MSPB Hearing—Plaintiff commenced this action by filing the Complaint. (Doc. No. 1.) Although prepared by Plaintiff's counsel, the Complaint is poorly organized and the precise claims it seeks to raise are difficult to decipher. Nonetheless, it is clear enough that Plaintiff intends to raise claims pursuant to both the ADA and Rehabilitation Act for both disability discrimination and retaliation.

Defendant filed its Answer on March 13, 2013. (Doc. No. 9.) After the close of discovery, Defendant filed its motion for summary judgment on all of Plaintiff's claims on October 18, 2012. (Doc. No. 16.) The motion was fully briefed on December 28, 2012.[8] Oral argument was held on September 23, 2013.

---

8. On December 4, 2012, after Defendant filed its motion for summary judgment but before Plaintiff responded, Plaintiff's attorney, John McHugh, made a motion to withdraw as counsel due to Plaintiff's alleged failure to pay legal fees owed to him. (Doc. No. 22.) In an Order dated December 5, 2012, the Court denied the motion because the "Defendant's motion [was] mid-briefing, Plaintiffs opposition brief [was] due on December 12, 2012,

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proving that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (internal citations, quotation marks, and emphasis omitted).

In ruling on a motion for summary judgment, the court must resolve any ambiguity in favor of the nonmoving party. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir.2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996). As a result, summary judgment will not issue where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Accordingly, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir.2007) (quotation marks omitted). However, "a complete failure of proof concerning an essential element of the nonmoving party's case" renders summary judgment proper. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The Second Circuit has instructed that in employment discrimination cases, "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence," courts must exercise "an extra measure of caution" in determining whether to grant summary judgment. *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir.2006). Nonetheless, "a plaintiff must [still] provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.2008). The ultimate test remains "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir.2000).

## III. DISCUSSION

As alluded to above, the Complaint, despite using a fair amount of legal jargon, fails to clearly explain the specific claims or theories of discrimination or retaliation under which Plaintiff is proceeding. In addition, the Complaint likewise fails to identify the precise actions by Defendant that underlie those various claims. Instead, clarification as to Plaintiff's causes of action comes principally from Plaintiff's opposition brief to the instant motion. There, Plaintiff asserts—contrary to what is expressly alleged in his Complaint—that his discharge is not at issue here, as it was already resolved by the MSPB proceeding;

and the Court ha[d] previously granted Mr. McHugh an extension of the deadline to file the opposition brief." (Doc. No. 23.) Once all briefing and argument on this motion was complete, the Court granted Mr. McHugh's motion to withdraw at oral argument on September 23, 2013. (Tr. at 45–46.)

thus, Plaintiff now asserts that "this action concerns only the facts related to [P]laintiff's employment between February 15, 2010," when he returned to work at the MCC, "and July 20, 2011," when he was discharged. (Opp'n at 4–5.) The brief further clarifies that, with respect to Plaintiff's claims for discrimination and retaliation, there are two, and only two, actionable adverse actions: his initial TAD assignment and the BOP's refusal to honor his bids. (*Id.* at 14.) Nevertheless, Plaintiff's brief also asserts, for the first time, that his causes of action include a hostile work environment claim. (*Id.*).[9]

The Court will address each in turn, after first addressing the statutes underlying Plaintiff's claims and the need for Plaintiff to exhaust his administrative remedies before filing suit.

### A. ADA v. Rehabilitation Act

■ As a preliminary matter, while Plaintiff alleges claims pursuant to both the ADA and Rehabilitation Act, only the latter are appropriate. The ADA prohibits discrimination and retaliation by certain private sector employers as well as state and local government employers, but not the federal government. *See* 42 U.S.C. § 12111. "In the Second Circuit, Section 501 of the Rehabilitation Act provides the exclusive route by which federal employees may raise claims of employment discrimination on the basis of disability." *Carby v. Holder*, No. 11 Civ. 5775(DLC), 2013 WL 3481722, at *8 n. 9 (S.D.N.Y. July 10, 2013) (citing *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir.1998)). Accordingly, Plaintiff does not have a cause of action against Defendant pursuant to the ADA and thus,

only Plaintiff's claims pursuant to the Rehabilitation Act are viable.[10] Nonetheless, in determining whether illegal discrimination has occurred, the Rehabilitation Act generally tracks the ADA. *See* 29 U.S.C. § 791(g).

### B. Exhaustion of Administrative Requirements

■ The Rehabilitation Act requires that an employee exhaust certain administrative requirements prior to filing a suit in district court. *See Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir.2000); *Miller v. Potter*, No. 07 Civ. 1767(JFB)(ETB), 2007 WL 4615611, at *2 (E.D.N.Y. Nov. 29, 2007). Specifically, the employee must first seek EEO counseling within forty-five days of the actions alleged to be discriminatory and then file an EEO complaint with the agency that allegedly discriminated against the complainant. *See Boos*, 201 F.3d at 181. In order for the court to consider a particular claim of alleged discrimination, it must have been either explicitly raised during the EEO process or be "reasonably related" to claims that were. *Butts v. City of N.Y. Dep't of Hous., Pres. & Dev.*, 990 F.2d 1397, 1401–03 (2d Cir.1993); *Marinelli v. Chao*, 222 F.Supp.2d 402, 416 (S.D.N.Y.2002). As with claims under Title VII, " 'employment discrimination claims under the Rehabilitation Act are barred unless the employee has exhausted available administrative remedies.' " *Burritt v. Potter*, 06 Civ. 1754(AWT), 2007 WL 1394136, at *2 (D.Conn. May 10, 2007) (quoting *Hughley v. U.S. Postal Svc.*, No. 86 Civ.

---

**9.** During oral argument, Plaintiff made clear that the alleged hostile work environment was based on retaliation. (*See* Tr. 27:10–17, 28:15–17, 30:9–10.)

**10.** Defendant does not explicitly address this issue, but only analyzes Plaintiff's discrimina-

tion and retaliation claims "under the Rehabilitation Act." (Mem. at 10, 15.) At oral argument, Plaintiff conceded that only his claims under the Rehabilitation Act were valid. (Tr. 4:19–5:4.)

8487(SWK), 1992 WL 51495, at *3 (S.D.N.Y. Mar. 5, 1992)).

■ As Plaintiff stated in his brief, and reaffirmed at oral argument, he argues that only two allegedly adverse employment actions could serve as a basis for his discrimination or retaliation claims: (1) his "initial [TAD] assignment" to the first floor communication room, and (2) Defendant's continuing refusal "to honor his bids" requesting a reassignment. (Tr. 5:22–24.) The record is clear that, with respect to these claims, Plaintiff failed to exhaust his administrative remedies because he did not seek counseling within forty-five days of those incidents. After returning to work in February 2010, Plaintiff did not contact an EEO counselor until December 29, 2010—roughly ten months later. Therefore, to the extent that Plaintiff is complaining of his TAD assignment, his time to complain of that initial assignment had clearly expired. Accordingly, Plaintiff may not bring claims in federal court based on his initial assignment in February 2010. *See Boos,* 201 F.3d at 184–85 (affirming district court grant of summary judgment against plaintiff who failed to seek EEO counseling within forty-five days of any alleged adverse action).

■ Turning to his bids, Plaintiff has not provided any evidence to establish that he sought counseling within forty-five days of either the making or denial of such a request. In his opposition, Plaintiff points to deposition testimony indicating that he submitted a bid every quarter from February 2010 to July 2011. (*See* Hodges Dep. 102:23–103:5, 104:13–18, 108:14–19). However, there is no evidence in the record as to the precise month, let alone the precise date on which any of these bids was either submitted or rejected. Indeed, at oral argument, Plaintiff was unable to identify *any* evidence in the record referring to a specific date on which a bid was made or denied. (*See* Tr. 6:2–8:19.) Therefore, even if Plaintiff's testimony that he submitted a bid every *three months* is accepted as true, there is no evidence that he sought counseling within *forty-five days* of any alleged adverse action. *See Costanzo v. U.S. Postal Svc.,* No. 00 Civ. 5044(NRB), 2003 WL 1701998, at *5 (S.D.N.Y. Mar. 31, 2003) ("Compliance with these [administrative exhaustion] deadlines is a condition of the waiver of sovereign immunity and thus must be strictly construed." (quotation marks and citations omitted)). Accordingly, Plaintiff's claims based on the denial of his bids should be dismissed for failure to exhaust administrative remedies. *See Boos,* 201 F.3d at 184–85; *Darling v. Potter,* No. 04 Civ. 1467(PCD), 2005 WL 2045951, at *7 (D.Conn. Aug. 25, 2005) (dismissing claims based on allegedly adverse employment actions that occurred more than forty-five days prior to plaintiff's request for EEO counseling); *Costanzo,* 2003 WL 1701998, at *5 (holding that those incidents which are time-barred are not actionable).[11]

---

**11.** Although Plaintiffs failure to exhaust would appear to dispose of his discrimination and retaliation claims, the Court notes that there is at least some room for disagreement. In *Legnani v. Alitalia Linee Aeree Italiane,* the Second Circuit held that an employee bringing a complaint for retaliatory discharge under Title VII and the ADEA was not required to file a claim at the EEOC within 300 days of her discharge, or at all, because her complaint asserted that the discharge was in retaliation for a previously filed EEOC charge and thus was "reasonably related" to that charge. 274 F.3d 683, 684–87 (2d Cir.2001). It is not clear that this holding also applies to the Rehabilitation Act's requirement that Plaintiff seek counseling prior to bringing a lawsuit, nor is it apparent that Plaintiff's present claims based on his TAD assignment and bids are "reasonably related" to his 2007 EEO Complaint—which Plaintiff has not even entered into the record. *See Clarke v. Roslyn*

 As for his hostile work environment claim, Plaintiff is also required to exhaust the same administrative remedies. However, the law draws a distinction between incidents that could be considered " 'discrete' acts of alleged discrimination" and incidents that are otherwise "part [of] an ongoing hostile work environment." *Costanzo,* 2003 WL 1701998, at *5; *see generally Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Since hostile work environment claims "are based on the cumulative effect of individual acts," of which "a single act of harassment may not be actionable on its own," *Morgan,* 536 U.S. at 115, 122 S.Ct. 2061, an instance of harassment need not have occurred within the forty-five days preceding the employee's request for counseling so long as it is "part of a hostile work environment that allegedly occurred at least partly within the statutory period," *Costanzo,* 2003 WL 1701998, at *6. Here, at least some of the instances of harassment alleged by Plaintiff occurred within forty-five days of when he sought counseling and were explicitly mentioned in his Request Form seeking counseling. For example, Plaintiff specifically alleged that he was wrongly reprimanded on December 17, 2010 and that a supervisor improperly inquired into his work schedule on December 8, 2010. (Request Form.) As for the other alleged incidents, including those occurring more than forty-five days prior to Plaintiff's counseling request in December 2010, since Plaintiff is alleging that these are all part of the same chain of harassment, the Court finds that it is not barred from considering these incidents as part of Plaintiff's hostile work environment claim.

## C. Disability Discrimination Claims

Even if Plaintiff timely raised his initial TAD assignment and the denial of his bids in the administrative process, he would still be unable to make out a *prima facie* case of disability discrimination because he has not demonstrated that either of these actions constitutes "an adverse employment action."

 Plaintiff's employment discrimination claims are subject to the burden-shifting analysis applied in evaluating ADA claims. *See Stephan v. W. Irondequoit Cent. Sch. Dist.,* 450 Fed.Appx. 77, 79 (2d Cir.2011); *Stone v. City of Mount Vernon,* 118 F.3d 92, 96–97 (2d Cir.1997). Thus, Plaintiff must first make out a *prima facie* case of discrimination by showing that: (1) his employer is covered by the statute; (2) he was disabled within the meaning of the statute; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Stephan,* 450 Fed.Appx. at 79. "Once a plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the employer is able to do so, "[t]he burden then returns to the plaintiff to furnish evidence that the reason offered by the employer is a pretext." *Id.*

*Union Sch. Dist.,* No. 11 Civ. 2957(JFB)(AKT), 2012 WL 2916759, at *5 (E.D.N.Y. July 17, 2012) ("In determining whether a claim is 'reasonably related' to the EEOC charge, the focus should be on the factual allegations made in the [EEOC] charge itself ... and on whether those allegations gave the [EEOC] adequate notice to investigate the claims as- serted in court" (alterations in original) (quotation marks omitted)). Nonetheless, to the extent that Plaintiffs claims are exempted from the administrative exhaustion requirement, those claims still fail because Plaintiff cannot establish a *prima facie* case. *See* Sections III(C), (D) below.

The Second Circuit has noted that "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000). "To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quotation marks and citation omitted). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (quotation marks omitted).

While Plaintiff makes clear that he preferred to be in the communications room on the third floor instead of the first floor, he offers very little explanation or evidence as to any actual adverse impact from his assignment to the first floor. Although Plaintiff makes much of the fact that the first floor communications room was a "mess" and that he was told to clean it (Hodges Dep. at 119:3–120:24), Plaintiff also acknowledges that he enlisted several inmates to clean the room (*id.* at 125:19–20). Thus, while the assignment of additional undesirable job duties may make a new position materially inferior to a prior one, the fact that the undesirable aspects of the assignment were temporary and that Plaintiff did not actually need to perform that new duty undermines the materiality of this one-time assignment. And critically, the temporary mess in the room does not rise above the level of being a "mere inconvenience."

Plaintiff also argues that Defendant, by assigning him to this post and failing to grant him the positions for which he submitted bids, "cost him money by deeming [him] unqualified for overtime assignments." (Opp'n at 15.) In his interview with the EEO officer, Plaintiff recounts one incident in which Lieutenant Meredith needed someone to do overtime and Plaintiff volunteered, but Meredith did not permit Plaintiff to do the overtime due to his alleged or perceived disability. (Hodges Deck, Ex. 1 ("EEO Interview Tr.") at 166.[12]) Plaintiff fails to provide any further specific information as to how this adversely impacted him; however, even assuming that *any* denial of *any* overtime constitutes a materially adverse condition of employment, Plaintiff has not demonstrated that being denied this assignment was linked to his assignment to a TAD position or being stationed on the first floor. Similarly, Plaintiff provides no evidence from which to conclude that he would have received additional overtime had his bid for a third floor post been granted. Therefore, this single instance in which Plaintiff was allegedly denied overtime does not establish that his TAD assignment or position on the first floor instead of the third floor constituted a materially adverse condition of his employment.[13]

**12.** References to page numbers reflect the Bates Stamp number on the pages of Exhibit 1.

**13.** Plaintiff's brief also notes that during his interview with the EEO officer, Plaintiff stated that "he [did] not want to lose his law enforcement retirement for which he [was] eligible on October 1, 2013." (Opp'n at 11.)

The transcript of that interview suggests that Plaintiff's pension might be jeopardized if he was moved to a position that was "non-law enforcement." (EEO Interview Tr. at 159.) However, Plaintiff does not allege that his assignment to the position on the first floor was non-law enforcement or allege that the position actually had some adverse effect on his pension, and thus provides no basis for

Put simply, Plaintiff has failed to establish any materially adverse difference between his TAD assignment on the first floor and the position he bid for on the third floor. As a result, his subjective preference for the latter post is insufficient to establish his placement on the first floor as an "adverse action." *See Murphy v. Bd. of Educ. of Rochester City Sch. Dist.*, 273 F.Supp.2d 292, 305 (W.D.N.Y.2003) (holding that "Plaintiff may have been *subjectively* devastat[ed] by his transfer, but as explained, that is not sufficient to state a claim" (emphasis and alteration in original) (quotation marks omitted)); *see also Pacheco v. N.Y. Presbyterian Hosp.*, 593 F.Supp.2d 599, 618 (S.D.N.Y.2009) (noting that "[t]he fact that Plaintiff may not have wanted to transfer does not alter the analysis" as to whether the new position represents a materially significant disadvantage); *Watson v. Paulson*, 578 F.Supp.2d 554, 563 (S.D.N.Y.2008) ("A transfer that is truly lateral and involves no significant changes in an employee's conditions of employment is not an adverse employment action regardless of whether the employee views the transfer negatively."). And since Plaintiff has not established that he was subjected to any materially adverse action, he cannot make out a *prima facie* claim for disability discrimination. Consequently, the Court grants summary judgment in favor of Defendant with respect to Plaintiff's claim that either his TAD assignment or Defendant's failure to honor his bids constituted disability discrimination.

### D. Retaliation Claims

■ A similar analysis is applied to Plaintiff's retaliation claims, although the elements of the *prima facie* case differ slightly. To establish a *prima facie* claim

of retaliation under the Rehabilitation Act, Plaintiff must show (1) "that [he] engaged in protected activity, [ (2) ] that the [defendant] was aware of this activity, [ (3) ] that the [defendant] took adverse action against the plaintiff, and [ (4) ] a causal connection exists between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part in the adverse employment action." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir.2002) (quotation marks and citation omitted). Upon such a showing, the same burden-shifting analysis used in a discrimination claim is applied. *See Monachino v. Bair*, 769 F.Supp.2d 431, 439 (S.D.N.Y.2011) (noting that retaliation "claims under Title VII, the Rehabilitation Act, and the ADEA are all analyzed under the burden-shifting framework").

■ In the context of a retaliation claim, an employer's action is "materially adverse" where it is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (establishing standard in Title VII cases); *see also Warren v. Goord*, No. 06 Civ. 3349(PR), 2008 WL 5077004, at *2 (2d Cir. Nov. 26, 2008) (applying the same standard to retaliation claims under the ADA). In *White*, the Supreme Court noted that it used the word "material" to distinguish actionable retaliation from other "trivial harms" because "petty slights, minor annoyances, and simple lack of good manners" would not deter a reasonable employee from complaining of discrimination. *White*, 548 U.S. at 68, 126 S.Ct. 2405; *see also Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir.2010) (noting that "by requiring a

establishing that the first floor TAD assignment was materially adverse or inferior to the position on the third floor.

showing of *material* adversity, *White* preserves the principle that Title VII does not set forth a general civility code for the American workplace" (emphasis in original) (quotation marks omitted)).

■ Plaintiffs claims for disability discrimination and retaliation are premised on the same two employment actions—the initial TAD assignment to the first floor communications room and the refusal to honor Plaintiff's "bids" for an assignment to the third floor communications room. The Court finds that there is insufficient evidence from which a reasonable person could conclude that either of these constituted a materially adverse action for the purposes of a retaliation claim. *See Hicks,* 593 F.3d at 167 (affirming grant of summary judgment dismissing certain retaliation claims because evidence of adverse actions was "conclusory" and "lacked specifics"). As discussed above, the evidence of any adverse impact of either Plaintiff's initial TAD assignment or the denial of his bids for a position on the third floor is minimal, and Plaintiff has demonstrated little more than a subjective preference for being on the third floor rather than the first. *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.,* 461 F.3d 199, 209 (2d Cir.2006) (noting that the standard for assessing whether a change in job duties is materially adverse for the purposes of a retaliation claim is an objective, not subjective one). Therefore, the Court finds that neither of these actions would be "harmful" to a reasonable employee such that he would be deterred from complaining of discrimination. *See White,* 548 U.S. at 67, 126 S.Ct. 2405 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Accordingly, the Court finds that Plaintiff cannot make out a *prima facie* claim of retaliation based on these two events and therefore grants summary judgment for Defendant as to Plaintiffs retaliation claim to the extent that it is based on these particular adverse employment actions. *See Miller v. McHugh,* 814 F.Supp.2d 299, 321–22 (S.D.N.Y.2011) (granting government's motion for summary judgment on employee's retaliation claim because the disciplinary actions alleged by plaintiff did not cause sufficient injury or harm).

### E. Hostile Work Environment

■ As a preliminary matter, Defendant objects to Plaintiffs hostile work environment claim, contending that "the complaint filed in this action does not raise a hostile work environment claim" and that Plaintiff first advanced this claim in his opposition to the present motion. (Reply at 9–10.) The Court agrees. Although hardly a model of clarity, the Complaint explicitly asserts two causes of action. The first asserts that, as a result of his "2006 EEOC Complaint, [as well as] the assistance [P]laintiff rendered to other correctional employees" in the filing of EEOC complaints, Plaintiff "was both retaliated against as well as discriminated against in not assigning him to posts for which he was qualified," in violation of "the Americans with Disabilities Act." (Compl. ¶¶ 22, 24.) The second is similar, alleging that "Plaintiff was assigned to an accommodation position at the MCC" and denied "bids for posts he could fill" in retaliation "for filing an EEOC complaint relating to his disability, and/or for rendering assistance to other employees seeking to pursue their statutory remedies." [14] (*Id.* ¶¶ 25, 26, 29.)

---

14. The incident referenced by Plaintiff in which he assisted another employee in filing a complaint, and about which his supervisors allegedly commented (Hodges Decl. ¶ 27), occurred back in January 2006 (Hodges Dep. at 62:6–14). The Court notes that Plaintiff is alleging that this incident is one of the reasons why Defendant later retaliated against

The second cause of action makes references and citations to several statutory and regulatory provisions, including Title VII, the ADA, and the Rehabilitation Act. However, neither cause of action makes any reference to the existence of a hostile work environment, nor do they seek remedies related to such a claim.

In fact, the only statement in the Complaint that could even arguably be said to have put Defendant on notice of Plaintiff's latent hostile work environment claim is contained in one sentence in the "Facts" section of the Complaint, in which Plaintiff alleged that "from February 2010, through and until December 2010, [P]laintiff was subjected to continual verbal harassment, including threats about status, counseling, absenteeism, supervision, and attorney representation with the then underlying federal lawsuit." (*Id.* ¶ 16.) But these few general assertions, tucked among Plaintiff's repeated and explicit allegations of discrimination, disparate treatment, and retaliation, would not have put a reasonable defendant on notice that Plaintiff was asserting a separate claim for hostile work environment. In that regard, this case is readily distinguishable from *Cruz v. Coach Stores, Inc.,* in which the Second Circuit approved of the district court's consideration of a hostile work environment claim because, (1) "although the complaint did not refer specifically to 'hostile work environment harassment,' it did describe the harassment [plaintiff] experienced in enough detail to put the claim before the court" and (2) "the numerous discovery disputes that took place over the course of the litigation concerned [plaintiff's] belief that she was the victim of sexual and racial

harassment, thereby foreclosing any argument that the defendants lacked any notice of [plaintiff's] claim." 202 F.3d 560, 568–69 (2d Cir.2000).

The facts here, considered in their totality, support a finding that Defendant was never put on notice that Plaintiff was asserting a hostile work environment claim until it was raised in Plaintiff's opposition brief on December 13, 2012 (Doc. No. 28)—more than one year after the Complaint was filed. Obviously, this is not the proper procedure for amending a pleading to add a new claim.[15] *See Fraser v. Fiduciary Trust Co. Int'l,* No. 04 Civ. 6958(PAC), 2009 WL 2601389, at *10 n. 8 (S.D.N.Y. Aug. 25, 2009) ("[Plaintiff] in effect is apparently attempting to add [a] claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion." (quoting *Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.,* 963 F.Supp. 1342, 1359 (S.D.N.Y. 1997))). Accordingly, Plaintiff's hostile work environment claim can be rejected without even reaching the merits.

▪ However, even on the merits, Plaintiff's hostile work environment claim fails. In order to state a claim for hostile work environment, a plaintiff "must first show that his workplace 'was permeated with discriminatory intimidation, ridicule, and insult,' that was 'sufficiently severe or pervasive to alter the conditions' of the victim's employment and create an abusive working environment." *Martinez v. City of N.Y.,* 338 Fed.Appx. 71, 73 (2d Cir.2009)

---

him, not that it is somehow part of the hostile work environment that he encountered after returning to work in 2010. (Opp'n at 4–5.)

**15.** Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that, at this stage in the litigation, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Therefore, Plaintiff should have filed a motion with the Court seeking leave to amend its Complaint.

(quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir.2003)). Put differently, "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, ... creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiffs. [membership in a protected class]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (alteration in original) (quotation marks omitted). The Supreme Court has made clear that "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■■■■ To determine whether a work environment is objectively hostile or abusive, courts employ a totality-of-the-circumstances test, which considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's 'work performance.'" *Acosta v. City of N.Y.*, No. 11 Civ. 856(KBF), 2012 WL 1506954, at *7 (S.D.N.Y. Apr. 26, 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir.2002) (quotation marks omitted); *see also Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir.1999) ("Isolated, minor acts or occasional episodes do not warrant relief.").

■■■ With respect to his hostile work environment claim, Plaintiff relies on ten instances or types of harassment: (1) his initial TAD assignment; (2) the denial of his bid requests; (3) his employer's instruction to clean a messy room on the first floor; (4) the denial of an overtime opportunity; (5) Defendant's search for new positions for Plaintiff that were all outside the MCC and non-law enforcement (*see* EEO Interview Tr. at 150–59); (6) the reprimands he received for conduct that he did not engage in (*see* Hodges Decl. ¶ 20); (7) the nonsensical and impossible to follow requirements with which he was asked to comply, such as never going to the third floor, and occasional reminders of such restrictions (*see* Hodges Dep. at 151:7–12, 152:10–25); (8) the change to Plaintiffs schedule without consulting him (*see id.* at 125:6–25); (9) the monitoring of what time he arrived and left work each day (*see id.* at 128:5–129:25); and (10) the marking down of his performance evaluation from "outstanding" to "excellent" (*id.* at 157:4–17; Simmons Decl., Ex. P ("2011 Evaluation")).

Significantly, Plaintiff concedes that none of the incidents listed above, standing on its own, was severe enough to constitute a hostile work environment. (Tr. 22:6–7.) Therefore, the only question is whether all of these incidents considered together created an environment in which the harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. Having carefully considered the entire record before it, the Court finds that Plaintiff has failed to make such a showing.

The vast majority of Plaintiffs complaints—that he was ordered to clean a messy room, reprimanded (perhaps unfairly) for being on the third floor without permission, monitored as to his comings and goings, and made to endure the indignities of schedule changes and a downgrade in his performance evaluation that was the equivalent of moving from an

"A+" to an "A"—are the sorts of everyday, unremarkable exchanges and minor altercations that are part and parcel of any workplace environment. None of these acts was "physically threatening or humiliating," nor has Plaintiff provided evidence that any of these acts "unreasonably interfere[d]" with his work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367. As such, they clearly do not amount to the kind of "discriminatory intimidation, ridicule, and insult" required to establish a hostile work environment. *Hayut*, 352 F.3d at 745. As Judge Jacobs noted in *Alfano*:

> Everyone can be characterized by race, sex, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

294 F.3d at 377. Here, as in *Alfano*, the Court finds that the majority of the incidents relied upon by Plaintiff are the sort of personnel decisions, which however harsh, unjust, or rude, are largely untethered to the claimed ground of discrimination and therefore entitled to little or "no weight whatsoever." *Id.*

The remaining instances of harassment cited by Plaintiff relate, once again, to his frustration with being assigned to the first floor communications room, notwithstanding his desire to be removed to a preferred assignment on the third floor. But this conduct, which the Court has already concluded did not amount to an "adverse action" for purposes of Plaintiff's retaliation claim, *see* Section III(D) above, likewise fails to establish the existence of a hostile work environment. Viewed in context, Plaintiff's assignment can hardly be said to have been "hostile or abusive," *Patane*, 508

F.3d at 113, particularly when one considers that the restrictions Plaintiff complains of were prompted by Plaintiff's own request for an accommodation and his own doctor's insistence that he was not capable of performing "all duties of a Correction Officer." (Def. 56.1 ¶ 15.) Although the parties clearly disagreed as to the ramifications of Plaintiffs asserted restrictions, the record is clear that it was Plaintiff who challenged the Department of Labor's finding that he was capable of unrestricted duty. (*Id.* at ¶¶ 15, 17–19). Having made that challenge, and having won an accommodation on the basis of his apparent disability, Plaintiff cannot easily accuse Defendant of retaliating against him merely for considering and adhering to the restrictions initially sought by Plaintiff. *See Alfano*, 294 F.3d at 378 (excluding from hostile work environment analysis those incidents for which there was no evidence in the record that they were motivated by an unlawful purpose).

Based on a careful consideration of the entire record and its context, the Court finds that no rational factfinder could conclude that Defendant's conduct created a workplace that was "permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [Plaintiffs] employment and create an abusive working environment." *Martinez*, 338 Fed. Appx. at 73 (quotation marks omitted). The Second Circuit has "erected a remarkably high hurdle with respect to the level and frequency of offensive conduct that must be present in order to sustain" a hostile work environment claim, *DelaPaz v. N.Y. City Police Dep't*, No. 01 Civ. 5416(CBM), 2003 WL 21878780, at *3 (S.D.N.Y. Aug. 8, 2003), and the Court has little trouble concluding that it is a hurdle that Plaintiff cannot clear.

Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's hostile work environment claim.

IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED in its entirety. The Clerk of the Court is respectfully requested to terminate the motion pending at Doc. No. 16 and close the case.

SO ORDERED.